IN THE UNITED STATES DISTRICT COURT
FOR THE
MIDDLE DISTRICT OF PENNSYLVANIA

WENDY L. DELACH,                    :
                                    :
          Plaintiff                 :
                                    :
     v.                             :     CIVIL NO. 3:12-CV-02401
                                    :
CAROLYN W. COLVIN, ACTING           :     (Judge Kane)
COMMISSIONER OF SOCIAL              :
SECURITY,                           :
                                    :
          Defendant                 :

## MEMORANDUM

Plaintiff Wendy L. Delach has filed this action seeking review of a decision

of the Commissioner of Social Security ("Commissioner") denying Delach's claim

for social security disability insurance benefits.  (Doc. 1).

Disability insurance benefits are paid to an individual if that individual is

disabled and "insured," that is, the individual has worked long enough and paid

social security taxes.  It is undisputed that Delach met the insured status

requirements of the Social Security Act through December 31, 2013.  Tr. 16, 147.

In order to establish entitlement to disability insurance benefits Delach was

required to establish that she suffered from a disability on or before that date.  42

U.S.C. § 423(a)(1)(A), (c)(1)(B); 20 C.F.R. §404.131(a)(2008); see Matullo v.

Bowen, 926 F.2d 240, 244 (3d Cir. 1990).

I.   **BACKGROUND**

Delach protectively filed her application for disability insurance benefits on

January 5, 2010, claiming that she became disabled on December 19, 2009.  Tr. 14,

127.  Delach has been diagnosed with several impairments, including: relapsing-

remitting multiple sclerosis, right eye optic neuritis, obesity, left hip pain, and

depression.  Tr. 16, 558.  On May 19, 2010, Delach's application was initially

denied by the Bureau of Disability Determination.  Tr. 56.

On June 10, 2010, Delach requested a hearing before an administrative law

judge ("ALJ").  Tr. 63.  The ALJ conducted a hearing on June 8, 2011, where

Delach was represented by counsel.  Tr. 29-53.    On July 1, 2011, the ALJ issued a

decision denying Delach's application.  Tr. 14-26.  On September 27, 2012, the

Appeals Council declined to grant review.  Tr. 1.  Delach filed a complaint before

this Court on November 30, 2012.   (Doc. 1).  Supporting and opposing briefs were

submitted and this case became ripe for disposition on May 18, 2013, when Delach

declined to file a reply brief.  (Docs. 10, 12).

Delach appeals the ALJ's determination on three grounds: (1) the ALJ erred

in finding that Delach did not meet or equal a listing at step three, (2) the ALJ

improperly discounted Delach's credibility, and (3) the ALJ's residual functional

capacity determination was not supported by substantial evidence.  (Doc. 10).  For

the reasons set forth below, the decision of the Commissioner is affirmed.

II.   **STATEMENT OF RELEVANT FACTS**

Delach is 38 years of age, is a high school graduate, and is able to read, write, speak, and understand the English language.  Tr.  32-33.  Delach's past relevant work includes work as a school bus driver, which is classified as medium, semi-skilled work, and work as data entry operator, which is sedentary, semi-skilled work.  Tr. 45-46.

### A.   **Delach's Physical Impairments**

On March 17, 2009, Delach presented to the York Hospital emergency room with slurred speech and left leg numbness and tingling.  Tr. 251.  A CT scan of Delach's brain was conducted which revealed "subcortical white matter hypodensity at the left vertex" and a possible lesion in the left parieto-occipital lobe.  Tr. 257.  This indicated possible demyelinating disease, although other causes such as a brain tumor could not be ruled out.  Tr. 256.  Consequently, on March 18, 2009, an MRI was performed on Delach's brain.  Tr. 258.  The MRI revealed diffuse white matter lesions in the subcortical region and deep white matter distribution bilaterally; these findings strongly indicated "demyelinating disease such as multiple sclerosis."  Tr. 259.  Delach was eventually diagnosed with relapsing-remitting multiple sclerosis ("MS").  Tr. 29, 558.  Anthony May, M.D., a neurological specialist, began a regimen of intravenous Solu-Medrol, one gram daily for five days, to treat the MS symptoms.  Tr. 278.

3

At a March 26, 2009 follow-up appointment, Dr. May noted that Delach had normal muscle strength, normal gait and station, and her reflexes were normal and symmetrical throughout. Tr. 354-55. At this appointment, Delach complained of severe fatigue. Tr. 356. On July 20, 2009, Delach reported to Dr. May that she had no new issues related to her MS, and reported that her fatigue had improved. Tr. 350. Dr. May again observed that Delach had normal muscle strength, normal gait and station, and her reflexes were normal and symmetric. Tr. 352.

On December 2, 2009, Delach presented to Tuan Vu, M.D. for a neurological follow-up. Tr. 337. Delach had no new MS symptoms, and a November 25, 2009 MRI demonstrated that, "over all there had been improvement [in her MS.]"[1] Tr. 337. On December 21, 2009, Delach suffered from an exacerbation of her MS and began experiencing blindness in her right eye. Tr. 479. Despite this serious exacerbation, Delach still had normal muscle strength throughout, normal gait and station, and her reflexes remained normal and symmetric. Tr. 480-81. On December 30, 2009, Delach presented for a follow-up with Kimberly Green, CRNP, complaining of mild pain and continued loss of vision in her right eye. Tr. 329. Ms. Green tested Delach's eyes and found that she had 20/20 vision in the left eye, but was nearly blind in her right eye. Tr. 330.

---

[1] The MRI showed "a significant decrease in the amount of active demyelination. Several other lesions show significant reduction in size . . ." Tr. 335.

On January 6, 2010, Delach presented to Dr. Christine Weld for an eye examination.  Tr. 235.  Dr. Weld observed that Delach's vision in her right eye had improved marginally; she was able to count fingers from three feet away.  Id.  Dr. Weld diagnosed Delach with optic neuritis[2] in the right eye.  Id.  Delach was referred to Shalom Kelman, M.D. for further evaluation of her eye.  Tr. 236.

On January 11, 2010, Delach presented to Dr. Kelman for an initial evaluation.  Tr. 247.  Delach stated that, during the past two weeks, her eye pain had disappeared and her vision had improved.  Id.  Tests revealed that, though Delach was color-blind in her right eye, her right eye vision had improved significantly to 20/25; vision in her left eye remained 20/20.  Id.  Dr. Kelman observed that there were signs of diffuse edema in Delach's right eye optic nerves. Id.  Dr. Kelman diagnosed Delach with inflamed optic nerves in the right eye secondary to MS, although Dr. Kelman noted that Delach "already demonstrates marked improvement in her vision."  Tr. 248.  A VER test indicated a "severe disorder involving the right optic pathway."  Tr. 296-97.

On January 18, 2010, Delach returned to Ms. Green for a follow-up appointment.  Tr. 325.  Ms. Green noted that Delach's vision was improving and her pupils were dilating with light.  Id.  Although Delach reported that her vision

---

[2] "Optic neuritis is an inflammation of the optic nerve, the bundle of nerve fibers that transmits visual information from your eye to your brain. Pain and temporary vision loss are common symptoms of optic neuritis." Mayoclinic.com, Optic Neuritis Definition, *available at* http://www.mayoclinic.org/diseases-conditions/optic-neuritis/basics/definition/CON-20029723 (last visited July 18, 2014).

was "somewhat better," she complained that it was "not close to her norm."  Tr.
326.  Delach's optical vision tested at 20/20 in her left eye, but 20/70 in her right
eye.  Tr. 327.  Delach denied any musculoskeletal or neurological issues, and
reported that she had no new numbness or weakness.  Tr. 326-27.

On January 29, 2010, Delach returned to Ms. Green; Delach was
experiencing an MS exacerbation that led to increased numbness and weakness in
her right side.  Tr. 321.  Delach also complained that vision in her right eye had
deteriorated; she was not able to read the vision chart with this eye.  Tr. 321, 323.
Delach's muscle strength was normal; she also had normal reflexes, gait, and
station.  Tr. 323.  However, Ms. Green did note diminished sensation in Delach's
face, right arm, and right leg.  Tr. 322.  On February 8, 2010, Delach's
examination was slightly improved, and she again had normal muscle strength,
normal gait and station, and normal, symmetric reflexes.  Tr. 318-20.

On March 15, 2010, Delach reported continued visual loss in her right eye,
bowel and bladder urgency and frequency, as well as intermittent numbness and
weakness in her right leg.  Tr. 314-15.  Ms. Green noted that Delach's physical
exam was mostly normal; she had a normal gait and station, normal muscle
strength, and her reflexes were normal and symmetric.  Tr. 316-17.  On April 1,
2010, Delach presented to Dr. Vu.  Tr. 512.  Delach reported that she had no new
MS symptoms, her numbness was better, and her visual acuity had improved

6

slightly.  Tr. 512-13.  She also stated that she had painful spasms in the middle of

her back, although these were relieved by Tylenol.  Tr. 513.  Dr. Vu observed that

Delach had normal gait, station, muscle strength, and reflexes.  Tr. 514.

On April 17, 2010, Delach returned to Dr. Kelman and reported that she felt

her vision had worsened since the initial evaluation.  Tr. 400.  Dr. Kelman noted

that the optic nerves showed a "complete resolution of the edema . . . [t]he disc

space [was] normal in appearance with no pallor."  Id.  Tests revealed that

Delach's left eye visual acuity was 20/20, while her right eye visual acuity was

20/40; she remained color blind in her right eye.  Id.  However, Dr. Kelman

observed that Delach

> clearly is having some feigned response by demonstrating non-
> physiologic responses on tangent screen testing.  Her visual acuity
> was documented at 20/40 but I suspect that it is better than that.  She
> claims however that her vision is poor for unknown reasons . . . there
> is no evidence of any structural damage to the optic nerve, and there is
> no evidence of an afferent pupillary defect which was present on the
> last visit.  This indicates that indeed the optic neuritis is resolving.

Id.

On May 3, 2010, Delach informed Ms. Green that she was "doing well" and

her headaches were well controlled.  Tr. 515.  Ms. Green noted that Delach's exam

was stable.  Id.  Delach had a normal gait and station, normal muscle strength, and

her reflexes were normal and symmetric.  Tr. 517.  Two days later, Delach again

presented to Dr. Weld, who tested that Delach's vision at 20/20 in the left eye, and

7

20/40 in the right eye.  Tr. 364.  Dr. Weld recommended that Delach use "specs strictly for protection."  Id.

On July 28, 2010, Delach presented for her final appointment with Dr. Kelman.  Tr. 395.  Delach reported that the vision was not improving in her right eye, although she had no new neurological or constitutional symptoms from her MS.  Id.  Dr. Kelman reported that Delach's visual acuity tested at 20/20 for her left eye and 20/40 for her right eye.  Id.  Delach's optic nerves continued to "show resolution of edema."  Id.  Dr. Kelman noted that "[t]he examination again shows definite non-physiologic responses to visual field and visual acuity testing.  I did not confront the patient.  I suggested that there is very little objective evidence of damage to the optic nerve."  Id.

On August 9, 2010, Ms. Green reported that Delach's "MS exam [was] relatively stable."  Tr. 519.  Delach had a normal gait and station, normal muscle strength, and her reflexes were normal and symmetric throughout.  Tr. 522.  However, Delach did complain that her symptoms had worsened, and she had occasional loss of strength.  Tr. 520-21.  An August 18, 2010 MRI of Delach's brain showed active lesions and development of some new lesions.  Tr. 583, 608-10.  Ms. Green recommended an increase in Delach's Rebif dose to counter this.  Tr. 583.  On September 8, 2010, Elizabeth Skinner, D.O. noted that Delach reported no numbness or weakness.  Tr. 617.

On March 1, 2011, Delach complained of left hip pain, and stated that it felt "like [her hip was] going to give out." Tr. 628.  Paul Muccino, D.O. observed that Delach was able to walk without pain or an assistive device, and had no significant limp or discomfort.  Id.  Dr. Muccino opined that the pain was likely due to "snapping hip phenomenon of the iliopsoas" and recommended conservative therapy to treat the injury.  Id.

On March 7, 2011, Delach presented to Ravi Dukkipati, M.D. for a neurological review.  Tr. 606.  Dr. Dukkipati observed that Delach was "clinically stable with regards to her relapsing-remitting multiple sclerosis.  Neurological examination today shows no new findings of significance."  Id.  Dr. Dukkipati noted that, after Delach's last MRI showed active demyelination in the brain, she had been placed on intravenous steroids and had "been stable overall since that time."  Tr. 607.  Delach complained of fatigue, heavy legs, and almost daily headaches; however, her gait, station, and muscle strength were normal, and her reflexes were normal and symmetric.  Tr. 607-08.[3]

## B.   Residual Functional Capacity Assessments

On May 19, 2010 Maura Smith-Mitsky, M.D., a non-examining state agency physician, offered a residual functional capacity assessment of Delach.  Tr. 387-93.

---

[3] There were additional medical reported and MRI scans contained within the administrative record.  Tr. 639-56.  However, these records were presented for the first time to the Appeals Counsel and were not available to the ALJ.  Tr. 4.  Therefore, these records are not material to this appeal.

Dr. Smith-Mitsky opined that Delach was capable of lifting and carrying up to twenty pounds occasionally, and up to ten pounds frequently.  Tr. 388.  Dr. Smith-Mitsky also believed that Delach had limited depth perception, could only occasionally climb, kneel, crouch, or crawl, and must avoid even moderate exposure to extreme heat.  Tr. 389-90.  Otherwise, Dr. Smith-Mitsky believed that Delach was not limited in any way.  Tr. 388-90.

On September 15, 2010, Mike Lyons, M.D. examined Delach and completed a work ability evaluation.  Tr. 593.  Delach complained of four MS exacerbations during 2010 which included fatigue, numbness, and leg weakness.  Tr. 594.  Dr. Lyons noted that Delach had a "mostly normal" gait, a negative straight leg test, and good muscle strength and range of motion throughout her upper and lower extremities.  Tr. 595.  Dr. Lyons opined that Delach was no longer capable of performing her duties as a bus driver.  Tr. 596.

### C.    The Administrative Hearing

On June, 2011, Delach's administrative hearing was conducted.  Tr. 29-53. At that hearing, Delach testified that her medications helped control her symptoms. Tr. 34.  She also stated that her MS caused fatigue, depression, and insomnia.  Tr. 34.  Delach also testified that she experienced numbness in both legs and both arms; the numbness in her legs occurred approximately twice per week, while the

10

numbness in her arms occurred three to four times per week.  Tr. 35-36.  The

numbness would last for approximately thirty-five to forty minutes.  Tr. 36-37.

Delach stated that her right eye still bothered her; on cloudy days her vision

would be blurry and she would see dots in her vision.  Tr. 37.  She later stated that

she had blurry vision "[p]retty much all the time," but "some things that made it

worse."  Tr. 38.  Delach testified that she also needed to frequently use the

bathroom; she estimated that she used a bathroom twenty to twenty-five times per

day.  Tr. 42.  Her medications helped to slightly control this issue.  Id.

Delach testified that she usually woke up early in the morning and watched

the news until it was time to wake her three children up.  Tr. 40.  She would cook

meals and pick things up around the house, but otherwise left the chores to her two

older children.  Tr. 40-41.  Cooking consisted of mainly crock-pot meals, grilled

cheese, and garlic bread.  Tr. 42.  Delach also stated that she helps her children

with their homework.  Tr. 41.  Delach was unable to read due to her eye condition,

and stated that she did not have any hobbies.  Tr. 40, 41-42.  Despite her eye

condition, Delach still drove short distances for ten to fifteen minutes.  Tr. 42-43.

After Delach testified, Sheryl Bustin, an impartial vocational expert, was

called to give testimony.  Tr. 45.  The ALJ asked Ms. Bustin to assume a

hypothetical individual with the same vocational profile as Delach, who was

limited to sedentary work.[4]  Tr. 46.  Furthermore, the hypothetical individual could

only occasionally climb, balance, stoop, kneel, crouch, or crawl, and must avoid

extreme heat.  Id.  The individual was also limited to jobs that required only

occasional depth perception.  Id.

Ms. Bustin opined that this hypothetical individual would not be able to

perform Delach's past relevant work as a school bus driver, but would be able to

perform her past relevant work as a data entry clerk.  Id.  Furthermore, the

hypothetical individual would be capable of performing three other jobs that exist

in significant numbers in the national economy: a security system monitor, a

receptionist information clerk, and a "table worker quality control."  Tr. 46-48.

The ALJ then modified the hypothetical question to exclude jobs that required

more than occasional peripheral vision.  Tr. 48.  Ms. Bustin testified the

hypothetical individual would still be able to perform all three of the

aforementioned jobs.  Id.

Ms. Bustin testified that, if the individual were off task for up to twenty

percent of the day, she could still maintain those three jobs.  Id.  If the individual

would be out of work for two weeks per year due to medical issues, she could still

---

[4] Sedentary Work is defined by the regulations of the Social Security Administration as work
that "involves lifting no more than 10 pounds at a time and occasionally lifting or carrying
articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one
which involves sitting, a certain amount of walking and standing is often necessary in carrying
out job duties. Jobs are sedentary if walking and standing are required occasionally and other
sedentary criteria are met." 20 C.F.R. § 416.967.

perform those three jobs.  Tr. 48-49.  However, if the person were absent for more

than two weeks, she would likely lose her job.  Id.  On cross-examination, Ms.

Bustin stated that, if the individual required up to twenty restroom breaks during

the day, she would likely lose her job.  Tr. 51.

III.   **DISCUSSION**

In an action under 42 U.S.C. § 405(g) to review the Commissioner's

decision denying a plaintiff's claim for disability benefits, the district court must

uphold the findings of the Commissioner so long as those findings are supported

by substantial evidence.  Substantial evidence "does not mean a large or

considerable amount of evidence, but 'rather such relevant evidence as a

reasonable mind might accept as adequate to support a conclusion.'"  Pierce v.

Underwood, 487 U.S. 552, 565 (1988) (quoting Consolidated Edison Co. v.

N.L.R.B., 305 U.S. 197, 229 (1938)).  Substantial evidence has been described as

more than a mere scintilla of evidence but less than a preponderance.  Brown v.

Bowen, 845 F.2d 1211, 1213 (3d Cir. 1988).  In an adequately developed factual

record, substantial evidence may be "something less than the weight of the

evidence, and the possibility of drawing two inconsistent conclusions from the

evidence does not prevent an administrative agency's finding from being supported

by substantial evidence."  Consolo v. Fed. Mar. Comm'n, 383 U.S. 607, 620

(1966).

Substantial evidence exists only "in relationship to all the other evidence in the record," Cotter v. Harris, 642 F.2d 700, 706 (3d Cir. 1981), and "must take into account whatever in the record fairly detracts from its weight." Universal Camera Corp. v. N.L.R.B., 340 U.S. 474, 488 (1971). A single piece of evidence is not substantial evidence if the Commissioner ignores countervailing evidence or fails to resolve a conflict created by the evidence. Mason v. Shalala, 994 F.2d 1058, 1064 (3d Cir. 1993). The Commissioner must indicate which evidence was accepted, which evidence was rejected, and the reasons for rejecting certain evidence. Johnson v. Comm'r of Soc. Sec., 529 F.3d 198, 203 (3d Cir. 2008). Therefore, a court reviewing the decision of the Commissioner must scrutinize the record as a whole. Smith v. Califano, 637 F.2d 968, 970 (3d Cir. 1981).

The Commissioner utilizes a five-step process in evaluating disability insurance benefits claims. See 20 C.F.R. § 404.1520; Poulos v. Comm'r of Soc. Sec., 474 F.3d 88, 91-92 (3d Cir. 2007). This process requires the Commissioner to consider, in sequence, whether a claimant (1) is engaging in substantial gainful activity, (2) has an impairment that is severe or a combination of impairments that is severe, (3) has an impairment or combination of impairments that meets or equals the requirements of a listed impairment, (4) has the residual functional capacity to return to his or her past work, and (5) if not, whether he or she can perform other work in the national economy. See 20 C.F.R. § 404.1520. The

initial burden to prove disability and inability to engage in past relevant work rests on the claimant; if the claimant meets this burden, the burden then shifts to the Commissioner to show that a job or jobs exist in the national economy that a person with the claimant's abilities, age, education, and work experience can perform.  Mason, 994 F.2d at 1064.

### A.    The ALJ's Finding at Step Three

Delach first argues that the ALJ erred in finding that she did not meet or equal a listing at step three of the sequential evaluation process.  (Doc. 10). Specifically, Delach argues that she meets the criteria for listing 11.09, multiple sclerosis.  Id.

To be considered disabled at step three of the sequential evaluation process, an impairment or combination of impairments must meet or medically equal an impairment listed in the Social Security Administration's Regulations.  Williams v. Sullivan, 970 F.2d 1178, 1186 (3d Cir. 1992).  "'For a claimant to show that his impairment matches a listing, it must meet *all* of the specified medical criteria. An impairment that manifests only some of those criteria, no matter how severely, does not qualify.'"  Id. (quoting Sullivan v. Zebley, 493 U.S. 521, 529–30 (1990)) (emphasis in original).  The claimant "bears the burden of presenting medical findings showing that her impairment meets or equals a listed impairment."  Burnett v. Comm'r of Soc. Sec., 220 F.3d 112, 120 n.2 (3d Cir. 2000).  The

standard for meeting a listed impairment is higher than the standard for proving

disability at steps four and five.  See, Sullivan, 493 U.S. at 532.

Under listing 11.09, an individual is presumptively disabled if she suffers

from multiple sclerosis, accompanied by one of three symptoms.  20 C.F.R. pt.

404, subpt. P, app. 1, §11.09.  The claimant must show that his or her multiple

sclerosis is accompanied by either: (A) disorganization of motor function;[5] (B)

visual or mental impairments "as described under the criteria in 2.02, 2.03, 2.04, or

12.02;" or (C) "[s]ignificant, reproducible fatigue of motor function with

substantial muscle weakness on repetitive activity, demonstrated on physical

examination . . ." Id.

The ALJ's determination is supported by substantial evidence.  It is

undisputed that Delach suffers from multiple sclerosis; however, she failed to

sustain her burden of proving that her MS resulted in any one of the three

symptoms listed in the subparts to listing 11.09.  Under subpart A, Delach did not

show that she suffered from disorganization of motor function.  20 C.F.R. pt. 404,

subpt. P, app. 1, §11.09 (A).  There is not a single mention in the administrative

record of an abnormal gait or station; to the contrary, every medical record that

---

[5]  This must be "[s]ignificant and persistent disorganization of motor function in two extremities, resulting in sustained disturbance of gross and dexterous movements, or gait and station."  20 C.F.R. pt. 404, subpt. P, app. 1, §11.04 (B).

references Delach's gait and station noted that both were within normal limits.  Tr. 316, 319, 323, 352, 354, 480, 514, 517, 522, 595, 607.

Similarly, there is no evidence of a sustained disturbance of gross and dexterous movements in any of Delach's extremities.  Rather, the medical records show that Delach consistently had normal strength throughout her extremities, and no doctor ever observed any active issues with Delach's extremities.  Id.  Delach did complain of at least occasional numbness and weakness in her extremities; however, these were subjective complaints rather than objective findings.  Tr. 315, 520, 582, 628, 649.  Given the elevated burden of proof at step three and the ALJ's decision to discount Delach's credibility,[6] these subjective complaints alone are not sufficient to demonstrate that Delach met the requirements of subpart A.

Delach concedes that she does not meet the visual or mental impairment requirements of subpart B.  (Doc. 10, p. 7).  Lastly, Delach has not adequately demonstrated that she meets subpart C, which requires "[s]ignificant, reproducible fatigue of motor function with substantial muscle weakness on repetitive activity, demonstrated on physical examination . . ."  20 C.F.R. pt. 404, subpt. P, app. 1, §11.09 (C).  While Delach did complain of significant fatigue and muscle weakness, subpart C requires that this muscle weakness be "demonstrated on physical examination."  Id.  Here, Delach's physical examinations consistently

---

[6] As discussed in subsection B, the ALJ's decision to discredit Delach's subjective complaints is supported by substantial evidence.

revealed normal muscle strength throughout her body.  Tr. 316, 319, 323, 352, 354, 480, 514, 517, 522, 595, 607.  Consequently, the ALJ's finding at step three is supported by substantial evidence.

### B.   Assessment of Delach's Credibility

Next, Delach challenges the ALJ's determination that her testimony and subjective complaints were not entirely credible.  Tr. 21-22.  Delach bases her argument solely on the purported absence of medical evidence to support the ALJ's finding.  (Doc. 10).  An ALJ's credibility determination is entitled to deference by the district court because "he or she has the opportunity at a hearing to assess a witness's demeanor."  Reefer v. Barnhart, 326 F.3d 376, 380 (3d Cir. 2003).  However, "where a claimant's testimony as to pain is reasonably supported by medical evidence, the ALJ may not discount claimant's pain without contrary medical evidence."  Green v. Schweiker, 749 F.2d 1066, 1068 (3d Cir. 1984) (citing Smith v. Califano, 637 F.2d 968, 972 (3d Cir.1981)).

Here, the ALJ did base his decision, at least partially, on contrary medical evidence.  The ALJ noted that, although Delach complained of significant issues with her right eye, treatment notes demonstrated an absence of damage to the optic nerve and documented significant vision improvement.  Tr. 21-22.  The ALJ further noted that Delach's complaints of numbness and weakness in her extremities were undermined by treatment records showing only intermittent

complaints and physical examinations that demonstrated normal strength in her extremities. Tr. 21-23. The ALJ also cited medical reports documenting conservative treatment, and demonstrating that medication was effective in ameliorating Delach's MS symptoms. Tr. 22-23. Furthermore, the ALJ relied on the records of Delach's treating physician Dr. Kelman, wherein Dr. Kelman stated that he believed Delach was feigning her responses to medical tests. Tr. 22-23.

Consequently, it is apparent that the ALJ did rely on contrary medical evidence in finding that Delach's subjective complaints were less than credible. The ALJ also believed that Delach's credibility was "undermined" by an absence of supporting medical evidence and by Delach's "wide variety" of daily activities. Tr. 21, 23. Though this Court may have reached a different conclusion, the totality of evidence contained within the administrative record supports the ALJ's determination that Delach's complaints were not entirely credible.

### C.    Residual Functional Capacity Determination

Finally, Delach argues that the ALJ erred in finding that Delach could perform sedentary work. Tr. 18, 25. Specifically, Delach argues that Ms. Bustin's testimony undermines the ALJ's finding, particularly where Ms. Bustin testified that an individual who required twenty bathroom breaks per day or missed three weeks of work per year would be unemployable. Tr. 48-51.

Ms. Bustin did testify that an individual would be unable to sustain gainful employment at an unskilled job if she missed three weeks of work per year due to illness.  Tr. 49.  Ms. Bustin also testified that an individual would be unemployable if she required twenty or more bathroom breaks during the workday.  Tr. 50-51. Thus, if the ALJ had accepted Delach's subject complaints as true, he would be required to find that Delach was disabled.  However, the ALJ rejected Delach's alleged symptoms, and found that her "statements concerning the intensity, persistence and limiting effects of these symptoms are not credible . . ."  Tr. 21.

As previously discussed, this conclusion was supported by substantial evidence and, consequently, the ALJ's determination that Delach was capable of sustaining gainful employment was likewise supported by substantial evidence. Additionally, Delach's argument is undermined by the fact that no doctor ever opined that Delach was more limited than the ALJ found her to be.  See, Burns v. Barnhart, 312 F.3d 113, 129 (3d Cir. 2002) ("Importantly, [the claimant] does not point to any relevant medical opinion that supports his allegations that his pain and exertional limitations are more severe than the ALJ found them to be.").

## IV.  **CONCLUSION**

A review of the administrative record reveals that the decision of the Commissioner is supported by substantial evidence.  Pursuant to 42 U.S.C. § 405(g), the decision of the Commissioner is affirmed.

An order consistent with this memorandum follows.

BY THE COURT:

s/Yvette Kane
Yvette Kane
United States District Judge

Dated: August 6, 2014